The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
November 5, 2020

## 2020COA157

## No. 19CA1245, *Begley v. Ireson* — Attorneys and Clients — Litigation Privilege

A division of the court appeals affirms the district court's entry
of summary judgment in favor of defendants based on application of
the litigation privilege under the standard set forth in *Begley v.
Ireson*, 2017 COA 3 (*Begley I*).  *Begley I* established that the
litigation privilege may immunize an attorney's prelitigation
statement if (1) the statement is related to prospective litigation and
(2) the prospective litigation is contemplated in good faith.  *Id.* at ¶
17.

First, the division rejects the plaintiffs' argument that the
attorney's statements were not protected by the litigation privilege
because they were not defamatory and instead concludes that the
litigation privilege may shield nondefamatory statements.

Second, the division concludes that the attorney's statements related to the prospective litigation because there was no dispute that they were made after he was retained to represent clients in connection with damages alleged to have been caused by construction activities on the plaintiffs' property, related to the construction project and the contemplated litigation, and were made to individuals closely connected with the contemplated litigation.

Finally, the division concludes that the plaintiffs failed to meet their burden to establish a genuine issue of material fact regarding whether the attorney contemplated the litigation he later filed on behalf of his clients in good faith. In so doing, the division concludes that the filing of a lawsuit is insufficient, standing alone, to establish that the litigation was contemplated in good faith. Instead, the fact that litigation was subsequently commenced is one factor a court can consider when determining whether an attorney contemplated the litigation in good faith.

Court of Appeals No. 19CA1245
City and County of Denver District Court No. 15CV30222
Honorable J. Eric Elliff, Judge

The Belinda A. Begley and Robert K. Hirsch Revocable Trust, Belinda A. Begley, and Robert K. Hirsch,

Plaintiffs-Appellants,

v.

Myrtle Ireson; Lisa Harris, as Special Administrator of the Estate of Virginia Hoeckele; Andrew J. Gibbs; and Gibbs-Young, LLC,

Defendants-Appellees.

JUDGMENT AFFIRMED, ORDER REVERSED,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE BROWN
Dunn and Freyre, JJ., concur

Announced November 5, 2020

Robert K. Hirsch, P.C., Robert K. Hirsch, Belinda Ann Begley, Denver, Colorado, for Plaintiffs-Appellants

Gordon & Rees, LLP, John R. Mann, Denver, Colorado; Jonsen Law Firm, LLC, Eric R. Jonsen, Broomfield, Colorado, for Defendants-Appellees Myrtle Ireson and Lisa Harris

McElroy, Deutsch, Mulvaney & Carpenter, LLP, Glendon L. Laird, Greenwood Village, Colorado, for Defendants-Appellees Andrew J. Gibbs and Gibbs-Young, LLC

¶ 1    Plaintiffs-appellants, Belinda A. Begley, Robert K. Hirsch, and the Belinda A. Begley and Robert K. Hirsch Revocable Trust (collectively, Begley and Hirsch), appeal the district court's order granting summary judgment in favor of defendants-appellees Andrew J. Gibbs and Gibbs-Young, LLC (together, Gibbs) and granting partial summary judgment in favor of defendants-appellees Myrtle Ireson and Lisa Harris, as Special Administrator of the Estate of Virginia Hoeckele (together, Ireson and Hoeckele). Begley and Hirsch also appeal the district court's award of costs to Gibbs.

¶ 2    Applying the litigation privilege as articulated in *Begley v. Ireson*, 2017 COA 3 (*Begley I*), we affirm the entry of summary judgment. However, because the district court did not conduct a hearing, we reverse the award of costs to Gibbs and remand the case for further proceedings solely on that issue.

I.    Background

¶ 3    Begley and Hirsch own residential property in the Washington Park neighborhood of Denver on which they wished to demolish the

1

existing house and build a new one. Ireson is their neighbor on one side and Hoeckele was their neighbor on the other.[1]

¶ 4  Begley and Hirsch contracted with Forte Development Group, LLC, owned by George R. Saad, to undertake the project. In mid-September 2014, Forte demolished the existing home and, on or about October 1, 2014, began shoring work necessary to excavate the basement of the new home.

¶ 5  Begley and Hirsch allege that Ireson and Hoeckele, individually and through Gibbs as their attorney, made statements, threats, and complaints that their respective properties had been damaged during construction, which caused Forte to cease all construction work as of October 2, 2014, and to breach the construction contract. According to Begley and Hirsch, when excavation finally began again on January 15, 2015, Gibbs threatened police intervention and demanded the work stop.

¶ 6  On January 20, 2015, Begley and Hirsch filed a complaint against Ireson, Hoeckele, and Gibbs, asserting claims for intentional interference with contract and intentional interference

---

[1] Hoeckele died during the litigation and her estate was substituted as the defendant party.

with prospective contractual relations.  Nine days later, Ireson and Hoeckele filed their own lawsuit, Denver District Court Case No. 15CV30352, against Begley, Hirsch, and Forte, among others.

¶ 7     Hoeckele moved to dismiss Begley and Hirsch's complaint under C.R.C.P. 12(b)(5) for failure to state a claim upon which relief can be granted, arguing that her allegedly tortious conduct was protected by the litigation privilege.  Ireson and Gibbs joined in the motion.  The district court dismissed the complaint, holding that Begley and Hirsch failed to allege that Ireson and Hoeckele caused Forte to breach the contract, and that Gibbs's conduct was absolutely privileged.

¶ 8     Begley and Hirsch appealed, and a division of this court reversed.  *Begley I*, 2017 COA 3.  First, the division concluded that the complaint sufficiently alleged that Ireson and Hoeckele caused Forte to breach the contract.  *Id.* at ¶ 11.  Second, the division concluded that the litigation privilege attaches to an attorney's prelitigation statements only if (1) the prelitigation statement relates to prospective litigation and (2) the prospective litigation is contemplated in good faith.  *Id.* at ¶¶ 17, 23.  Because the district court did not address whether the prospective litigation against

3

Begley, Hirsch, and Forte was contemplated in good faith, the division reversed and remanded for further proceedings. *Id.* at ¶¶ 24-26.

¶ 9    On remand, Gibbs moved for summary judgment and the district court granted the motion. It applied the two-part rule set out in *Begley I* and concluded that Begley and Hirsch failed to meet their burden to demonstrate a genuine dispute of material fact with respect to either part. The court later awarded Gibbs his costs as the prevailing party.

¶ 10    Ireson and Hoeckele also moved for summary judgment on the same grounds as Gibbs. The district court partially granted the motion. Considering its ruling on Gibbs's motion for summary judgment, the court concluded that Ireson and Hoeckele could not be vicariously liable for Gibbs's conduct because Gibbs's conduct was privileged. However, it concluded that genuine issues of material fact remained regarding the propriety of Ireson and Hoeckele's conduct before they retained Gibbs. The parties later filed a joint motion to dismiss with prejudice the remaining claims against Ireson and Hoeckele, which the court granted.

4

## II.     Analysis

### A.     Summary Judgment

¶ 11     Begley and Hirsch contend that the district court erred by concluding that application of the litigation privilege warranted summary judgment in favor of Gibbs, Ireson, and Hoeckele. Specifically, they argue that the court erred by (1) applying the litigation privilege to nondefamatory statements; (2) concluding that Gibbs's allegedly tortious conduct was related to contemplated litigation; and (3) concluding that Gibbs contemplated the litigation against them in good faith. We reject each contention in turn.

### 1.     Standard of Review

¶ 12     The determination of privilege is a question of law we review de novo. *Club Valencia Homeowners Ass'n v. Valencia Assocs.*, 712 P.2d 1024, 1027 (Colo. App. 1985).

¶ 13     We also review the entry of summary judgment de novo. *Shelter Mut. Ins. Co. v. Mid-Century Ins. Co.*, 246 P.3d 651, 657 (Colo. 2011). Summary judgment is appropriate when the pleadings, affidavits, depositions, and admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c);

*BA Mortg., LLC v. Quail Creek Condo. Ass'n*, 192 P.3d 447, 450 (Colo. App. 2008). For purposes of summary judgment, a "material fact" is one that will affect the outcome of the case. *Olson v. State Farm Mut. Auto. Ins. Co.,* 174 P.3d 849, 853 (Colo. App. 2007).

¶ 14 The party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. *Cont'l Air Lines, Inc. v. Keenan,* 731 P.2d 708, 712 (Colo. 1987). Once the moving party has met this initial burden, the burden shifts to the nonmoving party to establish a genuine issue of material fact. *Id.* "If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact . . . , a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Id.* at 713.

2. The Litigation Privilege Generally

¶ 15 Statements made by an attorney during or in preparation for pending legal proceedings are absolutely privileged so long as the remarks have some relation to the proceeding. *Begley I,* ¶ 13; *Club Valencia,* 712 P.2d at 1027. This absolute privilege exists "to encourage and protect free access to the courts for litigants and

6

their attorneys." *Begley I,* ¶ 13; *see also Westfield Dev. Co. v. Rifle Inv. Assocs.,* 786 P.2d 1112, 1117 (Colo. 1990).

¶ 16 In contrast, the litigation privilege attaches to an attorney's *prelitigation* statement only if (1) the statement is related to prospective litigation and (2) the prospective litigation is contemplated in good faith. *Begley I,* ¶ 17; *see also Merrick v. Burns, Wall, Smith & Mueller, P.C.,* 43 P.3d 712, 714 (Colo. App. 2001) ("Communications preliminary to a judicial proceeding are protected by absolute immunity only if they have some relation to a proceeding that is actually contemplated in good faith."); Restatement (Second) of Torts § 586 cmt. e (Am. Law Inst. 1977) ("As to communications preliminary to a proposed judicial proceeding, the [absolute privilege] applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration.").

3. The Litigation Privilege Shields Nondefamatory Statements

¶ 17 Begley and Hirsch first argue that the district court erred by entering summary judgment because they contend the litigation privilege shields only defamatory statements and Gibbs's

7

statements were not defamatory. Because the litigation privilege can apply to nondefamatory statements, we disagree.

### a. Preservation

¶ 18    Ireson and Hoeckele contend that this issue is unpreserved because Begley and Hirsch did not raise it with the district court until their motion to reconsider the order denying the parties' competing requests for C.R.C.P. 54(b) certification. Begley and Hirsch assert that they have been raising this argument "for five years," and cite their opposition to the original motions to dismiss filed by Ireson, Hoeckele, and Gibbs.

¶ 19    Because Begley and Hirsch did not raise this issue in connection with the motions for summary judgment, they arguably waived their right to raise it in this appeal. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992) (concluding that because the argument was not raised in response to summary judgment, it could not be raised on appeal). Nonetheless, in the interests of justice and judicial economy, we will address this argument on the merits.

### b. Analysis

¶ 20    Begley and Hirsch assert that the most damaging of Gibbs's statements were his demands that construction stop. They contend that, because such statements are not defamatory, they are not protected by the litigation privilege. They argue, "simply put, Colorado privilege law requires defamation." We are unaware of such a requirement.

¶ 21    Although the privilege was created to protect participants in judicial or quasi-judicial proceedings from liability for defamatory communications, *see Hoffler v. State Pers. Bd.*, 7 P.3d 989, 990 (Colo. App. 1999), *aff'd*, 27 P.3d 371 (Colo. 2001), it has been applied more broadly to immunize nondefamatory conduct. *See Westfield Dev. Co.*, 786 P.2d at 1118 (endorsing a qualified litigation privilege to intentionally interfere with performance of a contract); *Dep't of Admin. v. State Pers. Bd.*, 703 P.2d 595 (Colo. App. 1985) (relying on the litigation privilege to conclude that an employee was not subject to discipline for statements made during an administrative hearing). Indeed, "[t]he privilege not only shields attorneys from defamation claims arising from statements made during the course of litigation, but it also bars other non-

9

defamation claims that stem from the same conduct." *Buckhannon v. U.S. W. Commc'ns, Inc.*, 928 P.2d 1331, 1335 (Colo. App. 1996).

¶ 22     Begley and Hirsch cite *Buckhannon* and *Club Valencia* in support of their argument. True, those cases discuss application of the privilege to an attorney's defamatory statements, but that is because defamatory statements were the basis for the claims in those cases. *See Buckhannon*, 928 P.2d at 1334 (the plaintiff alleged the defendant's defamatory statements intentionally interfered with his contractual relations with a third party); *Club Valencia*, 712 P.2d at 1027 (the plaintiff asserted a libel claim). Neither case articulated a requirement that the offending conduct be defamatory before the litigation privilege applied.

¶ 23     In addition, in *Westfield Development Co.*, the supreme court considered and impliedly rejected such a requirement. There, the court considered whether the recording of a lis pendens constituted a privileged statement made in the course of a judicial proceeding. *Westfield Dev. Co.*, 786 P.2d at 1114. The plaintiffs claimed the mere filing of the lis pendens was actionable under theories of intentional interference with contract, malicious prosecution, and abuse of process; they did not allege that the lis pendens was

10

defamatory. *See id.* at 1116. In concluding that a qualified litigation privilege may apply, the court did not mention defamation. *Id.* at 1118. Instead, it held that "[t]he qualified privilege applies when (1) the interferer has, or honestly believes he has, a legally protected interest; (2) the interferer in good faith asserts or threatens to assert it; and (3) the assertion or threat is by proper means." *Id.*

¶ 24 And we note that applying the litigation privilege to shield nondefamatory litigation conduct is consistent with decisions from other jurisdictions. *See, e.g., Blanchette v. Cataldo*, 734 F.2d 869, 877-78 (1st Cir. 1984) ("[T]he Massachusetts courts have applied the privilege, not only in defamation cases, but as a general bar to civil liability based on the attorney's statements."); *Visto Corp. v. Sproqit Techs., Inc.*, 360 F. Supp. 2d 1064, 1068 (N.D. Cal. 2005) ("[The litigation privilege] is a defense to a number of torts, including intentional interference and defamation."); *W. Techs., Inc. v. Sverdrup & Parcel, Inc.*, 739 P.2d 1318, 1322 (Ariz. Ct. App. 1986) ("[T]he same privilege that bars [plaintiff's] action for injurious falsehood also bars its action for intentional interference with a contractual relationship."); *Levin, Middlebrooks, Mabie, Thomas,*

*Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994) ("[A]bsolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement or other tortious behavior such as the alleged misconduct at issue, so long as the act has some relation to the proceeding."); *Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel*, 151 P.3d 732, 752 (Haw. 2007) (applying litigation privilege to tort claims against lawyer arising from lawyer's management of inspection of corporate books and records); *Reynolds v. Schrock*, 142 P.3d 1062, 1069 (Or. 2006) (applying litigation privilege to attorney's alleged aiding and abetting of client's breach of fiduciary duty); *Clark v. Druckman*, 624 S.E.2d 864, 870 (W. Va. 2005) (applying litigation privilege to claims arising from lawyer's disclosure of experts in litigation and reasoning that there is "no reason to distinguish between *communications* made during the litigation process and *conduct* occurring during the litigation process").

¶ 25    Finally, the *Begley I* division did not say that the statement in question must be defamatory for the litigation privilege to apply even though it was aware of the nature of Gibbs's allegedly tortious

12

conduct. Instead, it articulated just two requirements: (1) the statement must relate to prospective litigation and (2) the prospective litigation must be contemplated in good faith. *Begley I*, ¶ 17.

¶ 26 Thus, we conclude that the litigation privilege may protect an attorney from liability for his nondefamatory statements.

### 4. Gibbs's Statements Related to Contemplated Litigation

¶ 27 Next, Begley and Hirsch contend that the district court erred by concluding that Gibbs's allegedly tortious statements "related to" contemplated litigation. We disagree.

### a. Additional Background

¶ 28 In their complaint, Begley and Hirsch alleged that Gibbs engaged in the following tortious conduct:

- On October 6, 2014, Gibbs interrupted a meeting between Begley, Hirsch, Saad, and a soils engineer and introduced himself as the attorney for Ireson and Hoeckele. "[He] behaved in an aggressive unprofessional manner that was outrageous. He told those present, 'This is not a shakedown,' in a manner that clearly conveyed that was exactly what it was intended to be.

13

When Plaintiff Begley resisted his bullying tactics, he told her 'she needed to be taught a lesson.' Using threats, intimidation and coercion, he deliberately frightened [Saad] and the soils engineer with accusations that permanently and adversely altered the relationships between all parties."[2]

- "Gibbs continued to make mail, email and telephone threats of legal action and demands," including sending a formal notice of claim pursuant to section 13-20-803.5, C.R.S. 2019, of the Construction Defect Action Reform Act (CDARA), which purportedly included inaccurate statements about the project.

- When excavation finally began again on January 15, 2015, Gibbs called Saad and demanded construction cease or Gibbs "would have the Denver sheriff stop him."

---

[2] Today, we decide only whether Gibbs's conduct is protected by the litigation privilege. Assuming Begley and Hirch's allegations are true, we express no opinion regarding whether such conduct aligns with the Colorado Rules of Professional Conduct. *See, e.g.*, Colo. RPC, Preamble ¶ 9 ("Zealousness does not, under any circumstances, justify conduct that is unprofessional, discourteous or uncivil toward any person involved in the legal system.").

- Gibbs demanded that he have the right to decide when and if construction would be allowed to continue and demanded that Forte provide him with "architectural and engineering materials for this purpose."

¶ 29    In support of his motion for summary judgment, Gibbs submitted an affidavit in which he averred as follows:

- He first spoke with Ireson on October 3, 2014, regarding the construction activities on Begley and Hirsch's property. He arranged to meet with Ireson on October 6, 2014, "to inspect the damage and discuss her retaining [his] firm to help recover the cost to repair her home."

- On October 6, 2014, he met with Ireson and observed recent damage to her home. He then met with Hoeckele and observed similar recent damage to her home. Ireson and Hoeckele agreed to retain Gibbs "to represent their interests relating to the damages to their homes and, if necessary, file a lawsuit against the responsible parties in the event settlement negotiations were unsuccessful."

- When he was leaving the meeting with Ireson and Hoeckele, he observed a meeting between Begley, Hirsch,

15

Saad, and the soils engineer. He approached, introduced himself as counsel for Ireson and Hoeckele, and "explained that [his] clients would like to discuss a solution to the damage the demolition caused to their homes in an effort to avoid litigation." He then showed Begley, Hirsch, Saad, and the soils engineer the damage to Ireson's and Hoeckele's properties.

- He and Hirsch exchanged correspondence "about [Hirsch's] construction project and to discuss resolution." Ultimately, he sent a notice of claim under CDARA.

- Having received no response to his efforts to "discuss settlement," he filed a lawsuit on behalf of Ireson and Hoeckele against Hirsch, Begley, and Forte, among others, on January 29, 2015.

¶ 30   Gibbs attached to his affidavit the following exhibits:

- An October 7, 2014, letter from Hirsch, in which Hirsch acknowledges meeting Gibbs the previous day and touring the properties of the "owners whom you represent." According to Hirsch, the letter served to "memorialize that [Gibbs] agreed that CRE 408 covers the

verbal offers [Saad] made to the owners to fix certain things on their properties.”

- An October 18, 2014, letter from Hirsch, in which Hirsch acknowledges receiving a voicemail from Gibbs the previous Friday.  It continues: “Speaking for [Begley] and myself, it seems premature to discuss anything until you assert a claim.”

- An October 21, 2014, email from Gibbs to Hirsch, asking the following questions: “Do I understand your correspondence to mean that you and [Begley] will not . . . discuss a resolution until we assert a claim?  At the risk of sounding confrontational, do we really need to initiate litigation just to get you to the table?”  The email concludes, “If you intend on denying all responsibility or do not intend to work toward a settlement, then please let me know now so that we begin that process sooner rather than [later].”

- A December 8, 2014, letter cataloguing Gibbs’s interactions with Begley and Hirsch, including the October 6, 2014, meeting, Gibbs’s voicemail to Hirsch,

and the letters and emails between Gibbs and Hirsch.  It says, "I emailed you on October 21, 2014 asking if litigation was *actually* necessary to discuss a resolution, but you never responded."  Attached to the letter are a CDARA notice of claim, two reports from a professional engineer Gibbs retained to evaluate the damage to his clients' properties, and a copy of a complaint "we will file in the Denver County District Court as soon as the Notice Claim period expires, in the event that we still cannot reach a settlement."  The letter adds that if Begley and Hirsch preferred to "forgo the Notice of Claim process," they could execute a waiver of service "to commence litigation immediately."

¶ 31    As relevant to this issue, in opposition to Gibbs's motion for summary judgment, Hirsch submitted an affidavit in which he averred as follows:

- "After the hiring of Andrew Gibbs by Hoeckele and Ireson as their attorney, and before the filing of the CDARA, Mr. Gibbs made a number of demands on us for money."

- Shortly after the October 6, 2014, meeting began, "Gibbs approached . . . and introduced himself as the lawyer representing Hoeckele and Ireson. He became argumentative and aggressive, accusing people of causing damages. He wanted copies of the soils reports for his experts to review."

- Gibbs made demands for money while refusing to articulate "duty, breach, causation, or damages" or "what the claims were." Although Gibbs said, "This is not a shakedown," "[i]n fact it was a shakedown."

- When Begley questioned Gibbs "about the basis upon which he was attributing responsibility [and] question[ed] what the injuries to the properties were, . . . Gibbs began yelling at Begley . . . and started to lecture her." Begley told Gibbs to stop lecturing her, and Gibbs "said 'some people need lecturing.' They argued for a few minutes and Gibbs refused to back down or apologize, instead saying twice, [Begley] 'needed to be taught a lesson.'"

- Construction stopped because Ireson, Hoeckele, and Gibbs demanded Forte stop all work on the project.

19

- Gibbs left him a voicemail on October 17, 2014, asking what repair plans existed and for the soils report, and he "replied in a letter that it was premature to discuss anything until Gibbs asserted a claim for his clients."

- On October 21, 2014, Gibbs sent him an email "threatening litigation, but again, declining to say on what basis he thought there was liability or responsibility or exactly how much money he wanted."

- On January 15, 2015, about three hours after excavation finally began again, Gibbs demanded construction stop.[3] Gibbs also demanded copies of architectural and

---

[3] In their original complaint, Begley and Hirsch alleged that, on January 15, 2015, Gibbs called Forte and demanded that construction cease or Gibbs "would go to [c]ourt that afternoon and would get an injunction to shut it down." After the defendants filed their motions to dismiss asserting the litigation privilege, Begley and Hirsch filed an amended complaint altering this allegation to include a threat by Gibbs to call law enforcement. In his summary judgment affidavit, Hirsch averred that Gibbs demanded construction stop, but did not say that Gibbs threatened either an injunction or police intervention.

engineering plans and stated he would be the one to
decide when construction would resume.[4]

¶ 32     The district court concluded that "[t]he pertinence requirement is hardly at issue" and that "[t]he undisputed facts show that all statements allegedly giving rise to [Begley and Hirsch's] claims were related to the construction project that took place on [their] property."

b.     Analysis

¶ 33     Begley and Hirsch contend that Gibbs's "improper interference" was related only to the construction project, not to the contemplated litigation, and that the district court erred by concluding the pertinency requirement was satisfied. We disagree.

¶ 34     To be privileged, an attorney's allegedly tortious statement "must have been made in reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue involved in it." *Club Valencia*, 712 P.2d at 1027. "The pertinency required is not technical legal relevancy, but

---

[4] Begley also submitted an affidavit in opposition to Gibbs's motion for summary judgment, which is largely consistent with and duplicative of Hirsch's affidavit.

21

rather a general frame of reference and relation to the subject matter of the litigation." *Id.* The litigation privilege "embraces anything that possibly may be relevant." *Id.* And, "[a]ll doubt should be resolved in favor of its relevancy or pertinency. No strained or close construction will be indulged to exempt a case from the protection of privilege." *Id.* at 1027-28.

¶ 35 In support of his motion for summary judgment, Gibbs offered evidence that he was retained by Ireson and Hoeckele to represent them in connection with the damage they allege was caused by the construction activities on Begley and Hirsch's property, including pursuing a lawsuit if necessary, before he engaged in any of the allegedly tortious conduct. Begley and Hirsch did not offer any contradictory evidence regarding the timing of or purpose for Gibbs's retention. On the contrary, in their complaint, they alleged that, "[a]t all times material herein[,] Defendant Gibbs represented Defendants Ireson and Hoeckele." Thus, it is undisputed that all of Gibbs's allegedly tortious conduct occurred after he was retained as counsel for Ireson and Hoeckele to, among other things, file a lawsuit.

22

¶ 36    All the statements Begley and Hirsch allege Gibbs made related to the construction project, damage to his clients' property, early settlement of potential claims, and initiation of litigation. All such statements related to "the subject matter" of the litigation ultimately initiated on behalf of Ireson and Hoeckele. And, all such statements were made to individuals closely connected with the contemplated litigation. *See id.* at 1027 ("[T]he maker of the statement and the recipient must be involved in and closely connected with the proceeding."). Nothing in the materials Begley and Hirsch submitted in opposition to summary judgment suggests a contrary conclusion.

¶ 37    Accordingly, the district court did not err by concluding that Gibbs's allegedly tortious conduct "related to prospective litigation." *Begley I*, ¶ 17.

    5.    Begley and Hirsch Failed to Meet Their Burden to Establish a Genuine Issue of Material Fact Regarding Gibbs's Good Faith

¶ 38    Begley and Hirsch contend that the district court erred by concluding that Gibbs contemplated the litigation against them in good faith. We disagree.

23

### a. Additional Background

¶ 39 The facts set forth in Part II.A.4.a above are relevant to this issue. As well, in the affidavit attached to his motion for summary judgment, Gibbs attested that "[a]t all pertinent times on and after my first meeting with Ms. Ireson and Ms. Hoeckele on October 6, 2014, I contemplated in good faith the filing of a lawsuit on their behalf if we were unsuccessful in a satisfactory resolution."

¶ 40 In the affidavit attached to Begley and Hirsch's response, Hirsch further attested to the following:

- During the October 6, 2014, inspections of the alleged damage, Ireson and Hoeckele admitted some of the damage was pre-existing and had been previously repaired.

- He and Begley were sent a CDARA notice, in which they were named as "construction professionals."

- Ireson and Hoeckele's request for a temporary restraining order to stop construction was denied "because [their] own expert . . . testified both that [their] homes were safe and that there was no irreparable harm done to their property."

### b. Analysis

¶ 41    Begley and Hirsch first contend that the district court erred by concluding that Gibbs contemplated the litigation in good faith because good faith is a question that cannot be resolved on summary judgment. Under the circumstances presented by this case, we disagree.

¶ 42    To determine whether there are disputed issues of material fact, we must interpret the meaning of "good faith" contained in the two-part standard articulated in *Begley I*. We have found little guidance on what constitutes "good faith" in this context, but Black's Law Dictionary (11th ed. 2019) defines "good faith" as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." *See also Credit Serv. Co. v. Dauwe*, 134 P.3d 444, 447 (Colo. App. 2005).

¶ 43    As an initial matter, we reject Ireson and Hoeckele's contention that the filing of the lawsuit on their behalf against Begley and Hirsch is enough, standing alone, to establish that

Gibbs contemplated the litigation in good faith. Adopting such a blanket rule ignores a concern the division in *Begley I* identified when it articulated the standard we apply now — specifically, that "an attorney could make a statement that tortiously interfered with a contract and then cloak it in the privilege by subsequently filing a bad faith and meritless claim related to the otherwise tortious statement." *Begley I*, ¶ 16. Therefore, we conclude that the fact that litigation was subsequently commenced is just one factor we consider when determining whether an attorney contemplated the litigation in good faith.

¶ 44 Typically, whether a person acted in good faith is a question ill-suited for resolution at the summary judgment stage. *See Montoya v. Bebensee*, 761 P.2d 285, 290 (Colo. App. 1988) ("In resolving the question of the existence of good faith, a reference to all underlying circumstances must be made. Proof of such state of mind involves a consideration of circumstantial evidence and of the reasonable inferences to be drawn therefrom. Thus, such an issue seldom can be resolved on a motion for summary judgment."). And a "mere declaration of good faith by an affiant is not sufficient to

resolve that issue in the face of a pleaded denial." *Martin v. Weld County*, 43 Colo. App. 49, 53, 598 P.2d 532, 534-35 (1979).

¶ 45 Here, however, Gibbs's declaration that he contemplated litigation against Begley and Hirsch in good faith was not the only evidence he offered in support of his motion for summary judgment. In his affidavit, he cited corroborating circumstantial evidence, including the timing and purpose of his retention by Ireson and Hoeckele, his communications with Begley and Hirsch attempting to settle the matter without having to initiate litigation, and the fact that he actually filed a lawsuit against Begley, Hirsch, Forte, and others. In addition, he attached to his affidavit correspondence reflecting the parties' mutual understanding that Gibbs was contemplating asserting a claim on behalf of Ireson and Hoeckele, Hirsch's correspondence declining to discuss settlement without a claim, a CDARA notice that is a statutory prerequisite to initiating litigation, expert reports prepared by professional engineers Gibbs retained to evaluate the damage to his clients' properties, and a draft complaint in substantially the same form as the one he later filed.

¶ 46 It can hardly be said that the only evidence of good faith offered in support of Gibbs's motion for summary judgment was his own "mere declaration." Thus, we conclude, as did the district court, that the evidence Gibbs offered satisfied his initial burden of demonstrating that there was no genuine issue of material fact regarding his good faith contemplation of litigation. *See Dauwe*, 134 P.3d at 446 (finding movant's summary judgment evidence satisfied his initial burden to demonstrate a lack of disputed issues of fact where he attested to his good faith and submitted corroborating evidence from the opposing party's discovery responses).

¶ 47 Once Gibbs met his initial summary judgment burden, the burden shifted to Begley and Hirsch to establish a triable issue of fact. *Keenan*, 731 P.2d at 712-13. That is, Begley and Hirsch had to present *some evidence*, by affidavit or otherwise, from which a fact finder could reasonably infer that Gibbs did not act with honesty in belief or purpose, did not act in faithfulness to his duty or obligation, did not observe reasonable commercial standards of fair dealing in the law, or acted with intent to defraud or to seek

unconscionable advantage of them. *See Dauwe*, 134 P.3d at 447-48. In this endeavor, they failed.

¶ 48    We agree with the district court that Begley and Hirsch's evidence reflects their subjective view that Ireson and Hoeckele had no valid claims against them and their subjective interpretation of Gibbs's conduct. It does not establish a genuine issue of material fact regarding Gibbs's good faith contemplation of litigation.

¶ 49    Begley and Hirsch first contend that Gibbs's refusal to explain to them the basis of their purported liability in their early communications demonstrates that he did not contemplate the litigation in good faith. Assuming the truth of this assertion, we are not persuaded by it. Certainly, by the time Gibbs filed the complaint, he had an obligation to have determined it was well grounded in fact and warranted by existing law, *see* C.R.C.P. 11, but we are not aware of any requirement that a lawyer be able to articulate specific causes of action to the opposing party to demonstrate good faith in *contemplating* litigation.

¶ 50    Further, the objective circumstantial evidence reflects a common understanding that Ireson and Hoeckele believed they had been damaged by construction activities on Begley and Hirsch's

property, and that Gibbs would file litigation on their behalf if settlement was not possible. For example, one day after their first meeting, Hirsch sent Gibbs a letter reflecting their "agree[ment]" that offers made by Saad to remedy the damage Ireson and Hoeckele identified were covered by CRE 408. That rule governs how settlement offers may be used as evidence in civil litigation. Thus, Hirsch demonstrated his early understanding that Gibbs was contemplating litigation. Later correspondence between the parties buttresses this conclusion.

¶ 51 Begley and Hirsch next contend that naming them as "construction professionals" in the CDARA notice demonstrates Gibbs's bad faith. Section 13-20-803.5 requires a litigant to engage in a notice of claim process as a prerequisite to initiating litigation against a construction professional. Gibbs sent Begley and Hirsch a notice pursuant to this CDARA provision. The term "construction professional" means "an architect, contractor, subcontractor, developer, builder, builder vendor, engineer, or inspector performing or furnishing the design, supervision, inspection, construction, or observation of the construction of any improvement to real property." § 13-20-802.5(4), C.R.S. 2019. We need not

decide whether Begley and Hirsch were "construction professionals" because the only potential consequence of Gibbs mis-labeling them in the CDARA notice is that the notice would be ineffective, and a new notice of claim procedure would have to be undertaken. Begley and Hirsch suffered no harm from being named "construction professionals." We see no bad faith.

¶ 52 Begley and Hirsch also contend that Gibbs's decision to not name Saad individually as a defendant in the lawsuit demonstrates his bad faith because Forte had been dissolved. They fail to explain, and we fail to see, how this decision demonstrates that Gibbs contemplated litigation against *them* in bad faith. And Ireson and Hoeckele ultimately reached a settlement with Forte, despite not naming Saad individually. *See Ireson v. Hirsch*, slip op. at ¶ 6 n.1 (Colo. App. No. 17CA0078, Apr. 12, 2018) (not published pursuant to C.A.R. 35(e)) (noting that Ireson and Hoeckele asserted that they sought dismissal of all claims in the litigation against Begley and Hirsch pursuant to a settlement agreement with Forte).

¶ 53 Finally, Begley and Hirsch contend that the litigation was not contemplated in good faith because it is meritless. They assert that the damages Ireson and Hoeckele have identified pre-existed the

31

construction activities on their property. And they highlight the denial of Ireson and Hoeckele's request for a temporary restraining order (TRO) to stop construction.

¶ 54    But there is a difference between bad faith and lack of success on a claim. As the district court explained, "[w]hile it is, of course, true that claims brought in bad faith must be, by definition, meritless, it does not follow that because a claim is meritless, it was contemplated in bad faith." Put another way, nothing in the definition of good faith requires success on the merits of the filed litigation. *See Visto Corp.*, 360 F. Supp. 2d at 1069 ("It is the *contemplation* of litigation that must be in good faith, not the merits of the actual litigation itself that animates the litigation privilege.").

¶ 55    And although the Denver District Court denied Ireson and Hoeckele's request for a TRO for failure to establish irreparable harm, it also concluded that the TRO request was not frivolous or groundless. *See Ireson,* No. 17CA0078, slip op. at ¶¶ 36, 40. That decision was affirmed on appeal by another division of this court, *id.* at ¶ 45, as was the Denver District Court's entry of summary judgment in favor of Ireson and Hoeckele on Begley and Hirsch's counterclaim for abuse of process, *id.* at ¶¶ 20-27. While these

decisions do not control our determination of good faith, we find them persuasive.

¶ 56 In the end, we conclude that Begley and Hirsch failed to establish a genuine issue of material fact as to whether Gibbs contemplated litigation against them on behalf of his clients in good faith. Having failed to meet this burden, we affirm the district court's entry of summary judgment.

## B. Costs

### 1. The District Court Must Conduct a Hearing

¶ 57 Begley and Hirsch contend that the district court erred by failing to conduct a hearing on Gibbs's request for an award of costs. We agree.

¶ 58 Pursuant to C.R.C.P. 121, section 1-22(1),

> [a]ny party that may be affected by the Bill of Costs may request a hearing within the time permitted to file a reply in support of the Bill of Costs. . . . When required to do so by law, the court shall grant a party's timely request for a hearing.

If a party contests the factual basis for or reasonableness of an award of costs and timely requests a hearing, the district court must hold a hearing. *Foster v. Phillips*, 6 P.3d 791, 796 (Colo. App.

1999); *Harvey v. Farmers Ins. Exch.*, 983 P.2d 34, 41 (Colo. App. 1998), *aff'd sub nom. Slack v. Farmers Ins. Exch.*, 5 P.3d 280 (Colo. 2000).

¶ 59 Begley and Hirsch opposed Gibbs's bill of costs, arguing that the costs claimed were unreasonable and unsupported. The same day, they filed a motion to set a hearing on Gibbs's motion for attorney fees and bill of costs. Without conducting a hearing, the district court awarded Gibbs most of the costs claimed. The same day, it denied as moot Begley and Hirsch's motion to set a hearing.

¶ 60 Begley and Hirsch timely requested a hearing, so the district court was obligated to hold one. Because it failed to do so, we reverse the award of costs and remand the matter to the district court to hold a hearing on Gibbs's bill of costs.

## 2. Gibbs Is the Prevailing Party

¶ 61 Begley and Hirsch contend that the district court also erred in awarding costs against them by finding that Gibbs was the prevailing party. Although we have already reversed the cost award, we address and reject this contention as it is likely to arise on remand.

¶ 62　We review an award of costs for an abuse of discretion.  *See S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein*, 2014 COA 171, ¶ 8.  A court abuses its discretion where its decision is manifestly arbitrary, unreasonable, or unfair, or where the court misapplies or misconstrues the law.  *Int'l Network, Inc. v. Woodard*, 2017 COA 44, ¶ 24.

¶ 63　C.R.C.P. 54(d) provides that "reasonable costs shall be allowed as of course to the prevailing party."  "A 'prevailing party' is one who prevails on a significant issue in the litigation and derives some of the benefits sought by the litigation."  *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230 (Colo. 2004).

¶ 64　The district court granted summary judgment in favor of Gibbs on all claims asserted against him by Begley and Hirsch.  There is no question he is the prevailing party.  The district court did not abuse its discretion in so finding.

### III.　Appellate Fees and Costs

¶ 65　In the concluding paragraph of their opening brief, Begley and Hirsch request appellate attorney fees.  Pursuant to C.A.R. 39.1, a party requesting attorney fees must include in its principal brief "a specific request, and explain the legal and factual basis, for an

35

award of attorney fees." Begley and Hirsch do not provide us with a legal or factual basis to award attorney fees. The request is denied.

¶ 66 Ireson and Hoeckele request an award of appellate attorney fees pursuant to C.A.R. 38(b), which authorizes such an award if we determine that an appeal is frivolous. They do not support this request with any argument. We do not find that Begley and Hirsch were unable to present a rational argument based on evidence or law, or that they prosecuted this appeal for the sole purpose of harassment or delay. *See Auxier v. McDonald,* 2015 COA 50, ¶ 29. And we have reversed the district court's order on one issue. Thus, the request is denied.

## IV. Conclusion

¶ 67 The district court's entry of summary judgment in favor of the defendants-appellees is affirmed. The district court's award of costs to Gibbs is reversed, and the case is remanded for a hearing on Gibbs's bill of costs.

JUDGE DUNN and JUDGE FREYRE concur.